BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

In re: TALLEY MULTIDISTRICT LITIGATION

No.

Clerk of the Panel
United States Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, NE
Room G-255, North Lobby
Washington, DC 20544-0005

BRIEF IN SUPPORT OF MOTION FOR TRANSFER PURSUANT TO 28 U.S.C. § 1407

# I. BACKGROUND

*A. The Parties and the Property Disputes*

Plaintiffs Kenneth R. Talley (age 90), Kristina Karen Talley, and Kurt R. Costello are *pro se* litigants who have been the subject of a continuous, coordinated pattern of eviction, ejectment, and due process denial spanning six years, two states, eight courts, four levels of the judiciary, 35 judicial officers and court officials, and 64 related legal proceedings. Exhibit J Index of 64 Related Cases. The pattern originates in a single property dispute: 28289 Broadkill Road, Milton, Delaware. Kenneth Talley and his late wife, Janice A. Talley (deceased 12/10/24), purchased the property in 1985 from a friend, Ray Burton, for $36,000. Judith C. Horn owed Kenneth Talley $29,798 at the time of purchase. Kenneth and Janice paid the full $47,250 by February 1993 and received a signed, notarized real estate contract bearing the signatures and initials of Judith Horn and Darren W. Horn, Sr. that match the dates on Mr. Talley's original receipts. Kenneth Talley worked for Judith Horn from 1985 to 2017, performing labor valued at approximately $330,586 as additional payment for the property. The total value of Kenneth Talley's interest in the property is approximately $377,000. In 2020, Judith Horn initiated eviction proceedings by pretending to be Ken's landlord, see Horn v. Talley, JP17-20-002965, Del. JP Court, Landlord-Tenant Eviction, No eviction ordered. Since that time, the Talley family, and Kurt Costello have been the subject of 64 related legal proceedings across the Delaware and Pennsylvania state court

systems and the federal courts in both the District of Delaware and the Eastern District of Pennsylvania. See Exhibit J Index of 64 Related Cases.

Brief Summary of Kenneth R. Talley

Kenneth R. Talley is a 90-year-old retired farmer that only had the opportunity to attend school up to the sixth grade after his mother passed away. Kenneth is never giving up his fight for constitutional rights, see *George A. Talley, A History of the Talley Family on the Delaware, and Their Descendants; Including a Genealogical Register, Modern Biography and Miscellany. Early History and Genealogy from 1686 (Philadelphia: Moyer & Lesher, printers, 1899)*. This citation establishes that fact that Kenneth Talley's family has been continuously present in Delaware and Pennsylvania since 1686 — four centuries — and that the family's identity as land-owning farmers in the Brandywine Hundred region is documented from the earliest colonial period. The family that built the roads, churches, and schools of Delaware is the same family whose 90-year-old member, Kenneth R. Talley, is the subject of ongoing unlawful eviction and ejectment proceedings. Kenneth Talley insists that he has a documented lifelong reading and writing disability at the first-to-second-grade level, which has been confirmed by two independent licensed examiners: Dr. Robert Mapou, Ph.D. (neuropsychological evaluation, report 11/1/24) and Dr. Laura Cooney-Koss, Psy.D. (forensic psychological evaluation, report 1/7/25). Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou. His diagnoses include Specific Learning Disorder (reading and written expression), Mixed Receptive-Expressive Language Disorder, Mild Cognitive Impairment, and severe hearing loss requiring bilateral hearing aids. His MoCA scores are 16/30 and 18/30. His EEG shows generalized background slowing indicative of mild diffuse cerebral dysfunction. His brain MRI shows extra-axial space changes compatible with cognitive decline. Dr. Cooney-Koss concluded: "It is this examiner's opinion that Mr. Talley was not competent to represent himself during his past legal proceedings." Dr. Mapou concluded that Mr. Talley "will be unable to fully understand court proceedings" and "will be unable to read and understand court documents independently." The court has been on notice of this disability since May 3, 2022, when the transcript of

Mr. Talley's own trial documented his inability to question witnesses, his failure to recall his prepared questions. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou

*B. The Single Factual Predicate*

Plaintiffs confirm a critical fact: All 64 related proceedings are downstream consequences of a single factual event: the May 2022, two-day trial in the Delaware Court of Chancery (C.A. No. 2021-0011-PWG), at which Judicial Officer Patricia W. Griffin presided and at which the court ordered Kenneth R. Talley — an indigent and elderly man with a first-to-second-grade reading and writing ability — to represent himself without counsel, without a jury, and without a guardian ad litem. The Delaware Court of Chancery's own published guidelines rate the feasibility of *pro se* practice in that court as "Very low" and note that its equitable procedures are "so specialized that the Court itself notes the substantial risks of unrepresented practice." The court's rules — briefing sequences, meet-and-confer requirements, discovery protocols, pretrial stipulations, expedited vs. non-expedited scheduling — are genuinely unlike any other court in the country. The uniqueness of the forum strengthens the due process argument for Mr. Talley significantly. It means the court's duty to ensure meaningful participation was heightened, not diminished, by the complexity of its own rules. State of Delaware courts *knew* of Ken's limitations and proceeded anyway, that is powerful evidence of a procedural due process violation under the 14th Amendment. Janice Talley and Kristina Talley informed the state courts in advance, in writing, that Mr. Talley had a sixth-grade education, and requested a continuance. Testimony and documents were removed from the trial transcript and records. The court denied a continuance when Janice Talley was bedridden in a rehabilitation facility. The court barred Kristina Talley from assisting Kenneth during the trial in any capacity. The court accepted a photocopy of the 1989 original typed deed on which the names of Kenneth and Janice Talley had been removed by Judith Horn using an office product known as white-out. The state courts excluded the signed, notarized real estate contract documenting the $47,250 payment. The 64 proceedings do not arise from 64 independent disputes. They arise from a single factual sequence: May 2022 trial → Chancery finding (no interest in property) → Superior Court

ejectment (Oct. 2023) → Physical removal by police (10/3/23) → Criminal trespass arrest → 64 subsequent proceedings. Every one of the 64 proceedings is a downstream consequence of the May 2022 trial. The common question of fact is not "are these 64 cases similar?" It is: "What happened at the May 2022 trial, and what did the court know at the time?" That question can only be resolved through a single discovery process. It requires: (1) the complete, unredacted trial transcript from May 2022 and June 2022; (2) the internal files of the Court of Chancery showing what information was in the court's possession at the time of the trial; (3) the communications between state and federal Judicial Officers in Delaware and Pennsylvania regarding Mr. Talley's case; (4) the law enforcement records from the October 3, 2023 execution; (5) the criminal case files for the three trespass arrests; and (6) the internal files of the Court of Chancery showing when the forensic evaluations (11/1/24; 1/7/25) were received and whether they were considered. No single district court can compel all of this discovery. The records span two states, four levels of courts, and multiple law enforcement agencies. Centralization allows one judge to issue one set of discovery orders that reach all of them. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou

*C. The Three Actions Before the Panel*

The three actions for which centralization is sought are:

1. Talley v. Horn, No. 1:23-cv-00982-MN (D. Del., Judge Noreika). Filed 9/6/23. Originally dismissed for lack of subject matter jurisdiction (Rooker-Feldman). The Third Circuit vacated the dismissal on 3/27/25, holding that Rooker-Feldman "does not apply" to the plaintiffs' claims, and remanded "for further proceedings" to determine diversity jurisdiction and the merits of the state law claims. The mandate was entered 4/18/25. *As of 10/26/26 — 526 days after the mandate — the District Court has not adjudicated a single claim on its merits.* Exhibit A Docket Report, 1:23-cv-00982-MN (D. Del.), PACER pull 10/25/26; Exhibit D Third Circuit Opinion, No. 24-2358, filed 3/27/25

2. Talley v. State of Delaware, No. 1:25-cv-00662-MN (D. Del., Judge Noreika). Filed 5/29/25. § 1983 action against the State of Delaware, Legal Services Corporation of Delaware, and Riverdale Park, LLC.

Amended Complaint filed 4/13/26. *As of 10/26/26 — 515 days after the original filing — no substantive adjudication on the merits has occurred. Nine motions filed by plaintiffs between 7/15/25 and 11/21/25 sat for 192 days without judicial action before being denied in a single bulk order on 1/23/26. Five additional Reconsideration motions filed 4/13/26 have been pending 196 days without ruling.* Exhibit B Docket Report, 1:25-cv-00662-MN (D. Del.), PACER pull 10/25/26

*3.* Talley and Costello v. State of Pennsylvania et al., E.D. Pa. No. 2:26-cv-8159-AMP, filed 10/23/26. § 1983 action under Ex Parte Young, 209 U.S. 123 (1908), against the State of Pennsylvania, Law & Associates, LLC, Michael Mullan, Marsha Mullan, and Joseph P. Riley and Sons Moving Company Inc. Emergency TRO and Injunctive Relief motions filed 10/23–25/26. *The 18-month delay in the trial Court, combined with the normal 60–90 day Sheriff's scheduling window, created a multi-month gap between judgment and execution. The bankruptcy filing on August 21, 2026, landed squarely in that gap. The automatic stay attached immediately. Sixty days later, with no relief from the stay ever sought or granted, by the Mullans-landlords the writ was executed anyway. The $28,800 escrow release five days after the filing compounds the willfulness. The pattern — five separate eviction proceedings over 30 months, each following the denial or dismissal of the prior one — supports an inference that the landlords' purpose was to exhaust the tenants' resources and legal options until the writ could be executed, and the bankruptcy filing did not stop the execution of another unlawful writ of possession, in conjunction with impounding the Plaintiff's vehicle, in conjunction with the action carried out by law enforcement.*

*D. The Documented Delay Pattern*

The dockets in Actions 1 and 2 — both assigned to Judge Noreika — document an identical pattern of delay:

| Metric | Action 1 (23-982) | Action 2 (25-662) |
|---|---|---|
| Total case duration | 1,173 days (3.2 years) | 515 days (17 months) |
| Written orders on merits | 2 | 0 |

| | | |
|---|---|---|
| Longest period of no judicial action | 219 days (8/4/25–3/17/26) | 192 days (7/15/25–1/23/26) |
| Reconsideration motions pending without ruling | 5 (4/13/26–present) | 5 (4/13/26–present) |
| Motions currently pending without ruling | 7 | 3 |

In Action 1, the Third Circuit remanded the case on 3/27/25 with the direction to proceed "for further proceedings." The mandate was entered 4/18/25. The District Court did not set a hearing for 411 days. The only judicial action after the remand was a five-line minute entry on 7/29/26 following a hearing at which the court reporter (Dale Hawkins) recorded the proceedings. No written order was issued. The minute entry states: "The transcript shall serve as the Court's ruling." Exhibit D Third Circuit Opinion, No. 24-2358, filed 3/27/25

In Action 2, nine motions filed by plaintiffs between 7/15/25 and 11/21/25 received no judicial action for 192 days. On 1/23/26, all nine were denied in a single order without individual analysis. The case was then referred to Magistrate Judge Laura D. Hatcher on 3/10/26. The referral was reversed on 4/1/26 — 22 days later. As of 10/26/26, no scheduling order, case management conference, or trial date has been set. While there is no specific statutory deadline that says "the district court must set a hearing within X days of the mandate," 411 days is not normal, 13.5 months of inactivity is well outside what is considered routine. ; Exhibit G Three-Instance Eviction Pattern Table

In Action 3, the first critical delay was the eighteen-month gap between the Municipal Court eviction filing on December 3, 2024, and the judgment for possession on June 2, 2026 — roughly 9–12 times the normal 3–6 week Philadelphia Municipal Court eviction timeframe — during which the FHC's May 2024 finding of no valid rental license (2012–2024) and no lead-safe certificate was already in the record, and the extended duration kept the case alive and pending well into 2026, setting the stage for the bankruptcy filing to land in the middle of an unresolved enforcement window, see Ex. H to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Phila. Fair Housing

Commission Final Order, Docket No. 20223-11-02-16083 (May 7, 2024)). The second critical delay was the two-and-a-half-month gap between the June 2, 2026 judgment and the August 21, 2026 bankruptcy filing, during which the writ had not yet been executed; in Philadelphia, the landlord must wait at least 21 days after judgment before a writ can be served (10-day appeal window plus 11 days after writ service), and Sheriff's scheduling typically adds another 60–90 days, meaning the automatic stay under 11 U.S.C. § 362(a) attached to a pending, unexecuted writ, staying the continuation of the judicial proceeding and any act to recover or retain property of the estate. The third and central violation was the sixty-day gap between the August 21, 2026 bankruptcy filing and the October 20, 2026 writ execution, during which the automatic stay operated immediately and automatically with no notice or court order required: five days later on August 26, $28,800 in escrow was released to the Mullans' counsel's company, Law Associates, Inc., c/o Tsiwen Milton Law, Esq., in violation of § 362(a)(3) and (a)(5); twenty-four days later on September 14, the Mullans' co-counsel, Octavio Antonio Arechavala, Esq. filed a 35-page response to the tenants' Motion for Declaration of Automatic Stay Violation, acknowledging the existence of the stay while continuing to pursue the writ; and sixty days later on October 20, the writ was executed, with the landlord and the moving company, Joseph P. Riley and Sons Moving Company Inc., physically removing the tenants, seizing their property, and taking their original court documents and medication — at no point during those sixty days was a motion for relief from the stay filed, granted, or even requested, and the writ was executed in the face of an unbroken, unmodified, unlifted federal automatic stay. 11 U.S.C. § 362(a) (stay "operates" automatically; no court order required); *In re Gruntz*, 166 F.3d 1020, 1024 (9th Cir. 1999) (state courts lack jurisdiction to determine applicability of the stay); *In re Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir. 1990) ("any action taken in violation of the stay is void and without effect"); *In re Schwartz*, 954 F.2d 569, 571 (9th Cir. 1992) (violations are void, not voidable). Mullans-Landlords have a total of four attorneys to fight two *pro se* tenants due to the lead paint levels documented by the Philadelphia Department of Public Health on March 18, 2026, that are 3000 times the accepted federal limits.

In Philadelphia, a straightforward eviction takes 3–6 weeks from filing to lockout: 10-day notice → 5–15 day hearing → 10-day appeal window → writ filed → 11 days to execution. Even with an appeal, the full process typically runs 2–4 months, or up to 9–12 months in contested cases.

*E. The Emergency Motions*

On October 16, 2026, Plaintiffs filed an Emergency Motion for Temporary Restraining Order in Action 2 (25-662, D.I. 112) pursuant to Fed. R. Civ. P. 65(b) pleading with the court to stop the emails and certified mail being sent to Mr. Talley's wife who is now deceased, Janice A. Talley. On October 17, 2026, Plaintiffs filed an Emergency Motion for TRO (D.I. 57) and a Motion for Preliminary Injunction (D.I. 56) in Action 1 (23-982), seeking to enjoin the defendants from selling, transferring, encumbering, or otherwise disposing of the property at 28289 Broadkill Road, Milton, Delaware. As of October 26, 2026 — ten and nine days after filing, respectively — no ruling has been entered on any of the three motions. The property is the subject of a pending Motion to Cancel *Lis Pendens* filed by defendants' counsel on September 6, 2026. The defendants can sell, transfer, or encumber the property at any time. The only protection is the court's own lis pendens, which the defendants are actively seeking to cancel. The court's failure to act on the emergency motions is not a crime. It is a procedural violation of Fed. R. Civ. P. 65(b), which requires the court to act "as soon as practicable" on TRO motions; a violation of Fed. R. Civ. P. 1, which requires the "fair, expeditious, and inexpensive determination of every action"; and, where the delay deprives the plaintiffs of an effective remedy, a due process concern under the Fourteenth Amendment. The delay is not an independent legal theory. It is the latest data point in the 526-day pattern of inaction documented in this motion, and it is the reason centralization before a different judge, with a firm scheduling order, is the only available remedy. Exhibit G Three-Instance Eviction Pattern Table.

*F. The 2353 East Cumberland Street Property*

Kristina Karen Talley and Kurt R. Costello have occupied 2353 East Cumberland Street, Philadelphia, PA 19125, since 2007. On August 21, 2026, both filed Chapter 7 bankruptcy petitions in the United

States Bankruptcy Court for the Eastern District of Pennsylvania (In re Costello, No. CN 26-13520; In re Talley, No. CN 26-13521), triggering the automatic stay under 11 U.S.C. § 362(a). Four days later, on August 25, 2026, $28,800 in escrow funds belonging to the tenants was released to Law Associates, Inc. in violation of the automatic stay. 11 U.S.C. § 362(a) (stay "operates" automatically; no court order required); *In re Gruntz*, 166 F.3d 1020, 1024 (9th Cir. 1999) (state courts lack jurisdiction to determine applicability of the stay); *In re Diesel Elec. Corp.*, 894 F.2d 371, 372 (10th Cir. 1990) ("any action taken in violation of the stay is void and without effect"); *In re Schwartz*, 954 F.2d 569, 571 (9th Cir. 1992) (violations are void, not voidable).

The state court's release of escrow funds occurred the same day as an ex parte telephone call from the landlords' attorney, Lynda Powell, Esq., to Judge Joshua Roberts of the Philadelphia Court of Common Pleas. The tenants filed a Motion for Declaration of Automatic Stay Violation on September 1, 2026. The Bankruptcy Court denied the motion on September 23, 2026. The tenants filed an Emergency Motion for TRO, a Motion for Order Staying Execution of Writ of Possession, a Motion for Appointment of Alternate Trustee under 11 U.S.C. § 325, and a Motion for Reconsideration. All were denied between September 23 and 28, 2026. The tenants filed a Notice of Interlocutory Appeal under 28 U.S.C. § 158(a)(3) on September 28, 2026. As of October 26, 2026, no ruling has been entered on the interlocutory appeal. On October 20, 2026 — two months after the bankruptcy filing and in the face of the automatic stay — the Philadelphia Sheriff's Office and the Philadelphia Police Department executed an unlawful eviction from the property using fabricated court paperwork. No valid Alias Writ of Possession was produced. The tenants had never been served with court documents in advance. The Philadelphia Fair Housing Commission had denied the eviction on May 7, 2024, upon finding that the landlords held no valid rental license for the period 2012–2024 and no valid lead-safe certificate, in violation of Philadelphia Health Code § 6-809(4). The Municipal Court judgment granting possession on June 2, 2026 was not final because the appeal is pending in the Pennsylvania Superior Court (No. 1604-EDA-2026), which found the trial court's 1925(b) order procedurally defective and directed a

supplemental opinion. At the execution, 3,794 items of personal property — including irreplaceable antiques, original art, family heirlooms, were seized by Joseph P. Riley and Sons Moving Company Inc. at the direction of the landlords. Kristina Talley's prescription medication for cyclic vomiting syndrome, a rare neurological disorder diagnosed in 2017, became inaccessible. On October 23, 2026, the tenants' vehicle was impounded on a fabricated parking violation, and a PPA tow operator with no legal authority unlocked the vehicle, entered the interior, and removed the original stamped court documents filed with the United States District Court for the Eastern District of Pennsylvania at 3:45 PM on October 23, 2026.

On October 25, 2026, at 12:57 PM, Robert W. Seitzer, Esq., counsel to Chapter 7 Trustee Lynn E. Feldman, confirmed in writing that the seized property "is either owned by Bread n Butter Antiques, LLC or claimed as exempt by the Debtor," and that "the Property is not property of the Debtor's bankruptcy estate, see Exhibit I Seitzer Letter, 10/25/26, confirming no trustee objection to property retrieval. As a result, the Trustee has no objection to the Debtor retrieving the Property." There is no bankruptcy hold. There is no trustee objection. There is no legal impediment to returning the property to the tenants. The defendants nonetheless refuse access to the property, the medication, and the court documents. State and federal courts in Delaware and Pennsylvania are responsible for constitutional violations. The Fair Housing Commission established a statutory bar to eviction on May 7, 2024. The Municipal Court granted possession notwithstanding that bar on June 2, 2026. The Court of Common Pleas excluded all of the tenants' evidence at the June 1–2, 2026 jury trial. The Superior Court has not yet ruled on whether the grant of possession in the face of the FHC statutory bar constitutes reversible error, *see* Ex. H to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Phila. Fair Housing Commission Final Order, Docket No. 20223-11-02-16083 (May 7, 2024)). The state courts had the authority to enjoin the execution of the writ. They did not. The federal courts failed to prevent the violation. The Bankruptcy Court had the authority under 11 U.S.C. § 105(a) to enjoin the state court proceedings that interfered with the automatic stay. It denied the tenants' Motion for

Declaration of Automatic Stay Violation on September 23, 2026, eleven days before the eviction was executed. It denied the Emergency Motion for TRO. It denied the Motion for Order Staying Execution of Writ of Possession. It denied the Motion for Appointment of Alternate Trustee. It denied the Motion for Reconsideration. It denied the Emergency Motion for Stay of Execution of Writ of Possession Pending Appeal under Fed. R. Bankr. P. 8007. The District Court, to which the tenants filed an Emergency Motion for TRO and a Motion for Injunctive Relief on October 23 and 25, 2026, has not ruled as of October 26, 2026. The result is that the automatic stay — the most powerful protective mechanism in federal bankruptcy law — was in effect for 60 days before the eviction was executed, and no court in either the state or federal system acted to prevent it. The property is in storage. The 30-day clock is running. The medication is inaccessible. On October 20, 2026, the Mullans-landlords committed multiple distinct legal violations: (1) an illegal "self-help" eviction in Philadelphia, which under Pennsylvania law (68 Pa. C.S. § 250.3) requires a court-issued Order for Possession before any removal, making the landlord liable for damages, costs, and attorney's fees; (2) wrongful seizure of the tenant's personal documents, including original court filings needed for the tenant's own lawsuit, which constitutes conversion and a separate civil tort; and (3) the taking of federal bankruptcy petition documents, which, if done with the intent to impede or obstruct the administration of a bankruptcy case, violates 18 U.S.C. § 1519 (obstruction of official proceedings) and potentially 18 U.S.C. § 152 (making false statements or concealing assets in bankruptcy), both federal criminal offenses carrying significant penalties. On October 20, 2026, the landlord and the moving company acting as its agent committed the following distinct legal violations in Philadelphia: (1) Illegal "Self-Help" Eviction. The landlord removed the tenant without a court-issued Order for Possession executed by a constable or sheriff, in violation of the Pennsylvania Landlord and Tenant Act of 1951, 68 P.S. §§ 250.501–250.503, which provides that the only lawful method of retaking possession is through the magisterial district court process. Self-help evictions (lockouts, removal of belongings, utility shutoffs) are strictly prohibited. (2) Wrongful Seizure and Withholding of Personal Property. The landlord seized the tenant's belongings—

including original court filings and prescription medication—and has refused access ever since. No written notice was provided, so the 10-day retrieval period under 68 P.S. § 250.505a (enacted by Act 129 of 2012, Act of July 5, 2012, P.L. 1091, No. 129, Cl. 68) never commenced. Because no lawful Order for Possession was ever executed, the property cannot be "deemed abandoned" under § 250.505a(b), and the landlord has no statutory authority to dispose of or withhold it. Subsection (f) further provides that "under no circumstances may a landlord dispose of or otherwise exercise control over personal property remaining upon inhabited premises without the express permission of the tenant." (3) Conversion (Common-Law Tort). The landlord's refusal to allow the tenant access to their property constitutes conversion under Pennsylvania common law, as the court recognized in Brown v. Premier Properties, 2014 Pa. & Cnty. Dec. LEXIS 64 (Mar. 6, 2014), where a landlord was held liable for $8,167 for refusing a tenant access to her belongings. The tenants may also pursue a replevin action under 231 Pa. Code § 1071–1080 (Subchapter E, Chapter 1000) to recover the property, potentially with an ex parte writ of seizure given the medical necessity of the medication. (4) Federal Obstruction of Bankruptcy Proceedings. The seizure and concealment of the tenant's original federal bankruptcy petition documents, if done with the intent to impede or obstruct the proper administration of a case filed under Title 11, violates 18 U.S.C. § 1519 ("Destruction, alteration, or falsification of records in Federal investigations and bankruptcy"), which criminalizes knowingly "conceal[ing]" any record, document, or tangible object with the intent to impede, obstruct, or influence the proper administration of any case filed under Title 11. The moving company, as the landlord's agent in carrying out the eviction and seizing the property, is potentially jointly and severally liable for all of the above. The original court documents are in the possession of the parties who directed their removal.

*G. The Disability and Age of the Primary Litigant*

Kenneth R. Talley is 90 years old. A forensic psychological evaluation (Dr. Laura Cooney-Koss, Psy.D., report 1/7/25) and a neuropsychological evaluation (Dr. Robert Mapou, Ph.D., report 11/1/24) established that Mr. Talley has:

- Specific Learning Disorder, reading (dyslexia), moderate
- Specific Learning Disorder, written expression, moderate
- Mixed Receptive-Expressive Language Disorder, mild
- Mild Cognitive Impairment
- Reading and writing ability at the first-to-second-grade level
- Severe hearing loss (bilateral hearing aids)
- MoCA score: 16/30 (5/1/24); 18/30 (8/14/24)
- EEG: "generalized background slowing in the theta range... indicative of mild diffuse cerebral dysfunction" (5/8/24)
- Brain MRI: "Extra axial spaces increased in size and morphology within the sylvian fissure, compatible with history of cognitive decline" (5/15/24)

Dr. Cooney-Koss concluded: "It is this examiner's opinion that Mr. Talley was not competent to represent himself during his past legal proceedings." Dr. Mapou concluded that Mr. Talley "will be unable to fully understand court proceedings" and "will be unable to read and understand court documents independently." The court has been on notice of this disability since the 5/3/22 Chancery trial, the transcript of which was reviewed by Dr. Cooney-Koss and which documented Mr. Talley's inability to question witnesses, see Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou Despite this documented disability, Mr. Talley was denied public legal aid (income: $13,000/year), denied IFP in the Court of Chancery on four separate occasions, designated "malicious" three times (4/25/24, 1/15/25, 8/4/26) without new factual basis, and forced to represent himself in a two-day trial in May 2022 and again in April 2024. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou.

Kristina Talley is legally disabled with cyclic vomiting syndrome, a rare neurological disorder diagnosed in 2017 and treated by Dr. Policarpo at Thomas Jefferson University Hospital, see Ex. P to Mullan v. Talley-Costello, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Medical

Documentation of Cyclic Vomiting Syndrome).The tenants' rental property contained lead paint at 3,000 times the accepted federal safety limit, as documented by the Philadelphia Department of Public Health in March 2026, *See* Ex. N to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (PDPH Lead Paint Inspection Report, Mar. 2026); see also *See* Ex. I to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Bay Hill Environmental Lead Paint Inspection Report, Jan. 2025) (documenting 108 lead paint violations). The lead exposure is a documented environmental trigger for worsening of gastrointestinal and neurological conditions. No Title II ADA accommodation were been provided in any state court proceeding, despite advanced notice to the ADA Coordinator.

*H. The 139 Documented Acts*

Between 2021 and 2026, eight courts in two states committed 139 documented acts of constitutional and statutory violation against the plaintiffs. The acts are documented in the courts' own dockets, orders, emails, receipts, and docket entries. They are not allegations. Exhibit H Summary of 139 documented acts - 35+ distinct legal provisions violated - Eight courts - Two states - Six years.

The Delaware Court of Chancery (33 acts) committed its violations through active misconduct: forcing an elderly indigent man with a first-to-second-grade reading level to represent himself; striking education testimony from the transcript; accepting a white-out-altered deed; denying IFP four times despite $13,000 income; designating the litigant "malicious" three times without new factual basis; sending six communications to the email address of a party who had been dead for twenty-two months; confirming in writing that certified mail was sent to the deceased's address; scheduling a hearing on the deceased's birthday; and telling the estate representative she "had a dead mother" and it didn't matter.

The United States District Court for the District of Delaware (33 acts) committed its violations through inaction: 175 days of silence before a dismissal; 219 days of silence before a bulk denial; 192 days of silence before another bulk denial; 411 days between the mandate and the first hearing; 526 days since

the mandate with no substantive adjudication; three emergency TRO motions pending without ruling; no scheduling order; no trial date; no ADA accommodation.

The Pennsylvania State Courts (33 acts) committed their violations through exclusion: excluding all tenant evidence at the jury trial; calling the lead evidence "not legit"; conducting 15 off-record sidebars; threatening physical removal; using fictitious service of process; granting possession notwithstanding a statutory bar; releasing $28,800 in escrow in violation of the federal automatic stay; and engaging in cross-state ex parte communications.

The Delaware Supreme Court (7 acts) denied four appeals without addressing the due process violations documented at trial. The Delaware Superior Court (9 acts) granted ejectment by force without a trial and never adjudicated the $377,000 claim. The Delaware Justice of the Peace Courts (11 acts) entered judgments against non-parties, dismissed power restoration requests during winter, and waited five months to rule. The Delaware Family Court (5 acts) barred the witness, then dismissed for lack of witness. The Delaware Court of Common Pleas (8 acts) sat in judgment while the judge's photograph hung on the wall, filed fictitious police reports, and refused to permit a trial.

The methods differ. The result is the same. In all eight courts, the plaintiffs' evidence was rejected, their disability was ignored, their property was removed, and their appeals were delayed or dismissed.

I. The *Lis Pendens*

The Court of Chancery has committed 33 documented acts of constitutional and statutory violation between 2021 and 2026. Among them is the pending Motion to Cancel Lis Pendens filed by defendants' counsel on September 6, 2026, which seeks to cancel two lis pendens notices: one recorded with the Recorder of Deeds and filed with the United States Court of Appeals for the Third Circuit in connection with No. 24-2358 (September 2024), and one recorded with the Recorder of Deeds and filed with the United States District Court for the District of Delaware in connection with No. 1:23-cv-00982-MN (September 2026, D.I. 55, Affidavit of Compliance with 25 Del. C. § 1605). Exhibit A Docket Report, 1:23-cv-00982-MN (D. Del.), PACER pull 10/25/26. The Court of Chancery has no jurisdiction to

cancel a lis pendens filed in connection with a federal action. Only the court in which the underlying action is pending possesses that authority. The Court of Chancery's attempt to cancel federal court filings is a jurisdictional overreach that centralization would resolve by placing all lis pendens questions before a single federal judge with authority over both.

## II. COMMON QUESTIONS OF FACT

Section 1407(a) requires that the actions involve "one or more common questions of fact." By its terms, the statute imposes no requirement that the common questions predominate over individual ones. 28 U.S.C. § 1407(a) ("[i]f civil actions involving one or more common questions of fact are pending in different districts...").

The following common questions of fact exist across all three actions:

### *A. Whether a Valid Predicate Judgment Existed Before Each Execution*

In each of the three physical removals documented in the public record, the central factual question is whether a valid, enforceable court order authorized the use of law enforcement to remove the plaintiffs from their dwellings:

| Instance | Date | Location | Order Cited | Validity Question |
|---|---|---|---|---|
| 1 | 10/3/23 | 28289 Broadkill Rd, Milton, DE | S22C-12-013-MHC (Del. Super. Ct.) | Ejectment granted without trial, in violation of Del. R. Civ. P. Super. Ct. 81 |
| 2 | 8/26/25 | 28470 Pocahontas Ave, Millsboro, DE | JP17-25-003717 (Del. JP Court 17) | Eviction entered against "Ashley Moore," a non-party who had not occupied the property in 10 years; the judge presiding was also the landlord |
| 3 | 10/20/26 | 2353 E. Cumberland St, Philadelphia, PA | 250102631 (Phila. CCP) | No valid writ of possession produced; automatic stay under 11 U.S.C. § 362(a) in effect; FHC had denied eviction 5/7/24, See Ex. H to Mullan v. Talley-Costello, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Phila. Fair Housing Commission Final Order, Docket No. 20223-11-02-16083 (May 7, 2024)). |

Resolving whether a valid predicate judgment existed in each instance requires discovery of: (1) the internal court files for each proceeding; (2) the law enforcement records documenting what documents were presented at each execution; (3) the communications between the private parties (Horns, Clarks, Mullans) and the law enforcement agencies; and (4) the criminal case files for the three trespass arrests (Nos. 2310001141, 2508014546, and the pending Philadelphia charge).

This question is common to all three actions. It cannot be resolved in any single district without access to records in both Delaware and Pennsylvania.

*B. Whether the Private Parties Coordinated With State Officials*

The second common question is whether the private parties who initiated the eviction and ejectment actions (Judith Horn, Kenneth S. Clark, Jr., Michael Mullan, Marsha Mullan) coordinated with judicial officers and law enforcement to execute the removals. The factual evidence of coordination includes:

1. Kenneth S. Clark, Jr. was simultaneously the judicial officer presiding over the eviction(s) behind the scenes and the landlord seeking possession (Instance 2).
2. The ex parte communications between judicial officers in Delaware and Pennsylvania (detailed in Section II.E below) suggest coordination across state lines.
3. The identical mechanism in all three instances — (1) initiate possession action, (2) execute through law enforcement, (3) arrest the tenant for trespass, (4) dismiss the criminal charges after the eviction is complete — is not a coincidence. It is an identifiable pattern of constitutional violations. Exhibit G Three-Instance Eviction Pattern Table

Resolving this question requires discovery of: (1) the internal communications of the Delaware State Police, the Philadelphia Sheriff's Office, and the Philadelphia Police Department; (2) the calendars and notes of the judicial officers involved, employed by both the State of Delaware and the State of Pennsylvania; (3) the financial records of the private parties showing benefit from the removals; and (4) the criminal case files.

This question is common to all three actions. It cannot be resolved in any single district.

*C. Whether the Judicial Officers Had Actual Knowledge of the Plaintiff's Disability*

The third common question is whether the judicial officers who presided over the plaintiffs' cases had actual knowledge — or should have had knowledge — that Kenneth Talley, the primary litigant only attended school up to the sixth grade and has a life-long documented first-to-second-grade reading and writing ability, and whether that knowledge affected their rulings on self-representation, IFP, and the "malicious" designation.

The forensic evaluations were completed 10/16/24 (Dr. Mapou) and 11/5/24 (Dr. Cooney-Koss). The reports were filed with the Court of Chancery. The "malicious" designations continued after the reports were filed (8/4/26), without considering them. The court's knowledge date, however, is earlier: the 5/3/22 Chancery trial transcript documents the incapacity, and Dr. Cooney-Koss reviewed that transcript in her evaluation, see Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou.

Resolving this question requires discovery of: (1) the Court of Chancery's internal files showing when the forensic reports were received and who reviewed them; (2) the District of Delaware's internal files showing when the reports were filed and whether they were considered in the IFP rulings; (3) the communications between the judicial officers regarding the plaintiff's competency. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou.

This question is common to all three actions because the same 35 judicial officers, including but not limited to: Mary Ellen Noreika, District Judge in the District of Delaware, Chief Justice Collins J. Seitz Jr., Justice Gary F. Traynor, Justice Abigail M. LeGrow, Justice N. Christopher Griffiths, Justice Karen L. Valihura, Paticia W. Griffin, Bonnie W. David, Mark H. Conner, Kenneth S. Clark, Jr, and Robert H. Robinson, appear in multiple cases, and the same disability was at issue in each, where this is a combination of both federal and state judicial officers in Delaware and Pennsylvania. Chief Justice Collins J. Seitz Jr., Justice Gary F. Traynor, Justice Abigail M. LeGrow, Justice N. Christopher Griffiths,

Justice Karen L. Valihura are the sitting justices during all four Delaware Supreme Court decisions in (Nos. 146, 2022; 53, 2023; 175, 2024; 429, 2024).

*D. Whether the IFP Denials Were Based on a Legitimate Financial Assessment*

The fourth common question is whether the IFP denials were based on a legitimate assessment of the plaintiffs' financial circumstances or on the "malicious" designation, which itself was based on an untested oral assertion made before the forensic evaluations existed. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou.

The plaintiffs were granted IFP in 8 cases across 5 courts and denied IFP in 7 instances across 4 cases, based on identical declarations of indigency. The one-week gap between the Bankruptcy Court's denial (9/23/26) and the Pennsylvania Supreme Court's grant (9/30/26) — same parties, same declarations, same week, opposite results — demonstrates that the only variable is the court.

Resolving this question requires discovery of: (1) the internal memoranda or notes supporting each IFP denial; (2) the financial information actually reviewed by each court; (3) the communications between the courts regarding the plaintiffs' financial status.

*E. The URL-Verified Evidence of Ex Parte Communications*

Plaintiffs additionally present publicly accessible records, authenticated by the URLs provided, which independently corroborate the ex parte communications described in the docket record. Each record is accompanied by the public Uniform Resource Locator (URL) from which it was captured. The URL permits any judge, party, or member of the public to independently navigate to the page and confirm the content. Fed. R. Evid. 901(b)(1), (b)(4), (b)(9). The records are notarized and attached as Exhibit C Notarized URL-Verified Records of Ex Parte Communications, 5 pages, notarized 9/14/26. They reference communications between:

- Judge Maryellen Noreika and Judge Collins J. Seitz, Jr. (Del. Supreme Court)
- Judge Maryellen Noreika and Judge Gary F. Traynor (Del. Supreme Court)
- Judge Maryellen Noreika and Judge Patricia W. Griffin (Del. Ct. Chancery)

- Judge Maryellen Noreika and Judge Mark H. Conner (Del. Super. Ct.)
- Judge Maryellen Noreika and Judge Robert H. Robinson, Jr. (Del. Super. Ct.)
- Judge Robert H. Robinson, Jr. (Del. Super. Ct.) and Judge Glynnis D. Hill (Phila. CCP)
- Judge Gary F. Traynor and Judicial Officer Bonnie W. David (Del. Ct. Chancery)

These records were presented to the District Court in the Motion for Recusal (Action 2, D.I. 57, filed 2/17/26). The Court denied the motion on 3/12/26 without addressing the URL-verified evidence. Under Liteky v. United States, 510 U.S. 540, 555–56 (1994), bias arising from an extrajudicial source is a proper ground for recusal under 28 U.S.C. § 455(a). Ex parte communications with one party concerning a pending matter are, by definition, extrajudicial. The Court's failure to address the URL-verified evidence means the Court never applied the correct Liteky standard. ABA Model Code of Judicial Conduct, Rule 2.9(A) (2020) provides: "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." The Delaware Code of Judicial Conduct, Rule 2.11, and the 28 U.S.C. § 455 standard impose the same prohibition on federal judges. Under In re Murchison, 349 U.S. 133, 136 (1955), "our system of law has always endeavored to prevent even the probability of unfairness," and "no man is permitted to try cases where he has an interest in the outcome." A judge who has engaged in ex parte communications with one side concerning the pending matters before the court has a direct, personal interest in the outcome. The Murchison holding applies with full force. Exhibit C Notarized URL-Verified Records of Ex Parte Communications, 5 pages, notarized 9/14/26.

Whether the communications documented in Exhibit C occurred, and whether they influenced the judicial officers' rulings, is a common factual question across all three actions. It can only be resolved through a single discovery process.

*F. Whether the State and Federal Courts Failed to Act to Prevent the Violation of the Federal Bankruptcy Stay*

The sixth common question is: Did the state and federal courts, each with independent authority to enjoin the execution of the writ, fail to act in the face of a pending federal automatic stay, and what is the legal effect of that failure on the validity of the eviction, the seizure of property, and the ongoing denial of access?

The automatic stay under 11 U.S.C. § 362(a) was in effect from August 21, 2026. The $28,800 escrow was released in violation of the stay on August 25, 2026. The Bankruptcy Court denied the Motion for Declaration of Automatic Stay Violation on September 23, 2026. The eviction was executed on October 20, 2026. No court in either the state or federal system acted to prevent the execution. The state courts had the authority to enjoin the writ. The federal courts had the authority under 11 U.S.C. § 105(a) to enjoin the state court proceedings. Neither acted.

This question is common to all three actions because the same pattern of judicial inaction in the face of a federal protective mechanism is documented in both districts. Exhibit G Three-Instance Eviction Pattern Table.

*F. Whether the State and Federal Courts Failed to Act to Uphold Federal and State Lead Paint Laws*

The seventh common question is: Did the state and federal courts, each with independent authority to enjoin the execution of the writ, fail to uphold federal lead paint laws, and what is the legal effect of that failure on Kristina's documented disability of cyclic vomiting syndrome as it relates to lead paint found within the property, the validity of the eviction, the seizure of property, and the ongoing denial of access?

The Mullans were aware of Kristina's disability and required to comply with the following federal, state, and municipal lead paint laws, all of which were violated with confirmation by the March 18, 2026 PDPH documentation of lead levels 3,000 times the federal standard: (1) Federal — Residential Lead-Based Paint Hazard Reduction Act of 1992 (Title X), 42 U.S.C. § 4852d, which requires landlords of

UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

pre-1978 housing to disclose any known lead-based paint or hazards, provide the EPA pamphlet "Protect Your Family From Lead in Your Home," and include a Lead Warning Statement in the lease before the tenant is obligated, with civil penalties up to $19,507 per violation; (2) Federal — 40 CFR Part 745, Subpart F (EPA's implementing disclosure regulations) and 24 CFR Part 35, Subpart A (HUD's implementing regulations), which together require the landlord to provide all available lead inspection records, risk assessments, and abatement reports to the tenant and retain the signed disclosure for at least three years; (3) Federal — 40 CFR Part 745, Subpart D, § 745.65 (EPA's Lead-Based Paint Hazard Standards), which defines a dust-lead hazard as surface dust containing a mass-per-area concentration of lead equal to or exceeding 10 μg/ft² for floors and 100 μg/ft² for interior window sills (revised effective January 12, 2026, to 5 μg/ft² for floors and 40 μg/ft² for window sills), meaning the PDPH's documented levels at 3,000 times the federal standard represent an extraordinary and actionable hazard; (4) Federal — 40 CFR Part 745, Subpart E (EPA's Renovation, Repair, and Painting Rule), which requires any renovation work disturbing more than 6 square feet of painted surface in a pre-1978 dwelling to be performed by an EPA-certified renovator using lead-safe work practices, with penalties up to $19,507 per day per violation; (5) Pennsylvania — 35 P.S. § 6022 et seq. (Pennsylvania Lead Poisoning Prevention Act), which governs the reporting of elevated blood lead levels and the occupational licensing of lead inspection, risk assessment, and abatement professionals, and under which the PDPH's March 18, 2026 documentation was generated; (6) Philadelphia — Philadelphia Code § 6-800 et seq. (Lead Paint Disclosure and Certification Law), specifically § 6-803(3)(a), which provides that "no lessor shall enter into a lease agreement with a lessee, other than a renewal lease, to rent any Targeted Housing unless the lessor provides the lessee with a valid certification prepared by a certified lead inspector stating that the property is either lead free or lead safe, and the lessee acknowledges receipt of the certification by signing a copy," and which requires the landlord to submit a copy of the certification, along with dust wipe test results, to the Philadelphia Department of Public Health; (7) Philadelphia — Philadelphia Code § 6-809(4), which requires a valid rental license as a precondition to lawful tenancy,

and which the FHC found the Mullans violated for the entire period 2012–2024 by holding no valid rental license; and (8) Philadelphia — the Lead and Healthy Homes Program (administered by PDPH), which requires the lead-safe certification to be based on an inspection no more than 48 months prior to the date a rental license is issued or renewed, and which mandates that the landlord repair or remove any chipping, peeling, or deteriorated paint and clean up lead-contaminated dust as a condition of maintaining the certification. The FHC's May 7, 2024 finding that the Mullans held no valid rental license and no valid lead-safe certificate for the period 2012–2024, in violation of Philadelphia Health Code § 6-809(4), establishes that the Mullans were out of compliance with both the federal and municipal lead paint regimes for the entire duration of the tenants' occupancy since 2007, the 2025 Bay Hill Report and the March 18, 2026 PDPH documentation of lead levels 3,000 times the federal standard confirms that the property was not lead-safe at any point during the tenancy. *See* Ex. H to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Phila. Fair Housing Commission Final Order, Docket No. 20223-11-02-16083 (May 7, 2024)). *See* Ex. P to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Medical Documentation of Cyclic Vomiting Syndrome). *See* Ex. N to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (PDPH Lead Paint Inspection Report, Mar. 2026). *See* Ex. I to *Mullan v. Talley-Costello*, No. 1604-EDA-2026 (Pa. Super. Ct. filed June 5, 2026) (Bay Hill Environmental Lead Paint Inspection Report, Jan. 2025) (documenting 108 lead paint violations).

## III. COURTS AS PARTIES AND JUDICIAL OFFICERS AS WITNESSES

Every one of the 64 proceedings is a downstream consequence of the Delaware Court of Chancery May 2022 trial, see Exhibit J Index of 64 Related Cases. Plaintiffs complain and argue that the Delaware Court of Chancery has highly complex rules and high fees ($500.00 to file an emergency motion) of any other court in America, where forcing indigent elderly Kenneth Talley, with a first to second grade reading and writing ability to represent himself, while simultaneously denying his *in forma pauperis* application(s), were unlawful acts of wanton negligence performed outside the administration of justice

because the court is aware, yet continually forcing Ken to proceed anyway. The Delaware Court of Chancery, established by the 1792 Delaware Constitution, is the direct American descendant of England's High Court of Chancery — the medieval court of the Lord Chancellor, originally called the "keeper of the King's conscience," which provided equitable relief when the rigid common-law courts could not. England abolished its own Chancery in the 1873–75 Judicature Acts. Most states merged their equity courts into law courts during the 19th century. *Delaware alone preserved the English model intact: a standalone, non-jury court of pure equity, with jurisdiction measured by statute as "coextensive with, and conformable to" that of the English High Court of Chancery as it existed in 1776.* Over 230+ years of continuous operation under that model, it has accumulated a body of corporate-law precedent unmatched anywhere else — making it the *de facto* national arbiter of American corporate governance. Plaintiffs request transfer to Pennsylvania. *After unlawful ejectment, Kenneth Talley asks to regain lawful possession of his home in Milton, DE until after a trial by jury as per Del. R. Civ. P. Super. Ct. 81, Delaware Constitution, Article I, § 4, and Delaware Constitution, Article I, § 9 where this legal fact is now proven by the trial scheduled in Clark v. Talley, C.A. No. S25C-02-029-RHR (Del. Super. Ct. filed Mar. 11, 2025) (removed to D. Del. July 17, 2026; trial May 2027).* See Exhibit J Index of 64 Related Cases. Kenneth Talley asks to retain his lawful residence(s) in Millsboro, DE until after a trial by jury. *After unlawful ejectment, Kristina Talley and Kurt Costello ask to return to their lawful residence in Philadelphia, PA until after a trial by jury. This request comes after on October 20, 2026, the Mullans-Landlords and the moving company acting as their agent executed a writ of possession in Philadelphia that was void ab initio and was used to commit a federal crime. The execution was unlawful on its face because neither the landlords nor the Philadelphia police officers present could physically produce a copy of the writ of possession that was being used to justify the removal — body camera footage from the scene shows police officers specifically denying the tenant's request to see the paperwork that was required to be served in advance in order to legally execute the writ. Under Pennsylvania procedure, a writ of possession must be served on the tenant at least 21 days before execution, and the executing*

*officer is required to possess and present the writ at the time of service. The absence of any physical document at the scene — confirmed by the officers' own refusal to produce it on camera — means the execution was not merely procedurally defective; it was a nullity, with no legal authority to enter, remove, or seize. This failure compounds the violations of 68 P.S. § 250.505a (enacted by Act 129 of 2012, Act of July 5, 2012, P.L. 1091, No. 129, Cl. 68), which requires the landlord to provide the tenant with written notice stating that personal property remains, identifying where it can be retrieved, and affording the tenant 10 calendar days from the postmark date to retrieve it or request storage; no such notice was ever provided, the 10-day period never commenced, and because no lawful Order for Possession was ever executed, the property cannot be "deemed abandoned" under § 250.505a(b), and subsection (f) provides that "under no circumstances may a landlord dispose of or otherwise exercise control over personal property remaining upon inhabited premises without the express permission of the tenant." The seizure and concealment of the tenant's original federal bankruptcy petition documents — documents that remain in the possession of the parties who directed their removal — in the face of the automatic stay under 11 U.S.C. § 362(a), which operated immediately and automatically upon the August 21, 2026 filing without notice or court order, violates 18 U.S.C. § 1519, which criminalizes knowingly concealing any record, document, or tangible object with the intent to impede, obstruct, or influence the proper administration of any case filed under Title 11. The writ of possession, an official document of the Commonwealth of Pennsylvania, was thus used as the instrument of a federal crime, and the body camera footage documenting the officers' refusal to produce it is direct, contemporaneous evidence that no lawful authority existed for the execution. The constitutional and statutory protections violated by this execution operate at every level of the legal hierarchy. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the federal automatic stay is the supreme law of the land, and a state court writ that contravenes it is void; the state court had no authority to act in the face of the stay, In re Gruntz, 166 F.3d 1020, 1024 (9th Cir. 1999) (state courts lack jurisdiction to determine applicability of the stay); any action taken in violation of the stay is void and without effect, In re Diesel Elec. Corp., 894*

*F.2d 371, 372 (10th Cir. 1990); and violations are void, not voidable, In re Schwartz, 954 F.2d 569, 571 (9th Cir. 1992). The Fourth Amendment prohibits unreasonable searches and seizures of persons, houses, papers, and effects; the Fifth Amendment guarantees due process and protects against the taking of property without due process of law; and the Fourteenth Amendment extends both guarantees to state actors, prohibiting any state from depriving any person of life, liberty, or property without due process of law. The Pennsylvania Constitution provides independent and in several respects stronger protections: Article I, Section 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed by the affiant") has been held by the Pennsylvania Supreme Court to afford greater protection than the federal Fourth Amendment, Commonwealth v. Edmunds, 526 Pa. 374, 586 A.2d 887 (1991), and in Rivera v. Borough of Pottstown, the Commonwealth Court held in December 2025 that Article I, Section 8 requires individualized probable cause before government officials may enter an occupied home without the resident's consent — a standard that the October 20 execution, conducted without any producible writ, without any prior service, and without any individualized judicial authorization, cannot satisfy. Article I, Section 11 of the Pennsylvania Constitution provides that "all courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay" — a provision the Pennsylvania Supreme Court has recognized as a fundamental right that guarantees a meaningful opportunity to be heard and a judicial remedy for any legal injury, and which the tenants' exclusion from the June 1–2, 2026 jury trial (where all of their evidence was excluded) and the subsequent denial of access to their property and court documents directly contravenes. The Pennsylvania Landlord and Tenant Act of 1951, 68 P.S. §§ 250.501–250.503, provides that the only lawful method of retaking possession is through a court-issued Order for Possession executed by a constable or sheriff, and self-help evictions are strictly prohibited. The tenants*

*may recover the property through a replevin action under 231 Pa. Code § 1071–1080, and the landlord's refusal to allow access constitutes conversion under Pennsylvania common law, Brown v. Premier Properties, 2014 Pa. & Cnty. Dec. LEXIS 64 (Mar. 6, 2014). The federal remedies available to the tenants include: 42 U.S.C. § 1983, which provides a civil cause of action against any person who, under color of state law, subjects a citizen to the deprivation of any right secured by the Constitution or laws of the United States; 42 U.S.C. § 1985(3), which provides a civil cause of action for conspiracy to deprive persons of their constitutional rights; 18 U.S.C. § 242, which makes it a federal crime for any person acting under color of law to willfully subject any person to the deprivation of any right secured by the Constitution or laws of the United States, punishable by up to one year in prison, or up to ten years where bodily injury results; 11 U.S.C. § 362(k)(1), which entitles the tenants to actual damages, costs, and attorney's fees for the willful violation of the automatic stay; and 11 U.S.C. § 105(a), which grants the bankruptcy court contempt jurisdiction over any violation of the stay. The moving company, as the landlord's agent in carrying out the eviction and seizing the property, is potentially jointly and severally liable for all of the above, and the original court documents remain in the possession of the parties who directed their removal.*

Courts are the parties and judicial officers are the witnesses — the 35 judicial officers, law enforcement officers, court staff, and private parties — are located in Delaware and Pennsylvania as follows: May 2022 trial → Chancery finding (no interest in a constructive life estate/trust) → Superior Court ejectment no trial as per Rule 81 (Oct. 2023) → Physical removal by police (10/3/23) → Criminal trespass arrest → 61 subsequent proceedings (evictions, appeals, § 1983 actions, judicial conduct complaints, bankruptcy filings, and the current three actions before this Panel) The common question of fact is "What happened at the May 2022 trial, and what did the court know at the time?" That question can only be resolved through a single discovery process. It requires: The complete, unredacted trial transcript from May 3, 2022 after the testimony about Ken's sixth grade education was removed. The internal files of the Court of Chancery showing what was in the court's possession at the time of the

trial. There are ex parte communications between the 35 judicial officers and court officials spanning two states, four levels of courts, and a period of six years, regarding Mr. Talley's cases. In Delaware, the state court officers include: Patricia W. Griffin, Master of the Court of Chancery; Bonnie W. David, Judicial Officer of the Court of Chancery; Mark H. Conner, Judge of the Superior Court; Kenneth S. Clark, Jr., JP/CCP Judge and landlord in JP Court 17 and the Court of Common Pleas; Robert H. Robinson, Judge of the Superior Court; Bethany Crowley, Judge of JP Court 17; William P. Wood, Judge of JP Court 17; Carl Danberg, Judge of the Court of Common Pleas; Calvin Scott Cline, Judge of the Superior Court; and five Justices of the Delaware Supreme Court who served during the pendency of the relevant proceedings — Collins J. Seitz, Jr. (Chief Justice), Gary F. Traynor, Karen L. Valihura (retired 7/25/26), Abigail M. LeGrow, and N. Christopher Griffiths. In Pennsylvania, the state court officers are: Glynnis D. Hill, Judge of the Philadelphia Court of Common Pleas; Joshua Roberts, Judge of the Philadelphia Court of Common Pleas; Christopher Hall, Judge of the Philadelphia Court of Common Pleas; and Nina Wright Padilla, President Judge of the Philadelphia Court of Common Pleas. In the federal courts, the officers include: Mary Ellen Noreika, District Judge in the District of Delaware; Patricia M. Mayer, Bankruptcy Judge in the Eastern District of Pennsylvania; Fred Baker of the U.S. Trustee's Office (Eastern District of Pennsylvania); and fourteen Circuit Judges of the Third Circuit — Stephanos Bibas, Michael A. Chagares, Thomas M. Hardiman, Patty Shwartz, Cheryl Ann Krause, Luis Felipe Restrepo, David J. Porter, Paul B. Matey, Peter J. Phipps, Arianna J. Freeman, Tamika R. Montgomery-Reeves, Cindy K. Chung, Emil J. Bove III, and Jennifer L. Mascott. The total is eighteen Delaware state court officers, four Pennsylvania state court officers, one federal district judge, fourteen federal circuit judges, one federal bankruptcy judge, and one U.S. Trustee's Office employee — thirty-five in all. Please note that Valihura was the sitting justice during all four Delaware Supreme Court decisions (Nos. 146, 2022; 53, 2023; 175, 2024; 429, 2024). The law enforcement records from the unlawful ejectment and arrest by police on October 3, 2023, including the subsequent arrest of Kenneth R. Talley; unlawful eviction and arrest by police on August 26, 2025; and unlawful eviction and arrest

by police on October 20, 2026. The criminal case files for the three trespass arrests are relevant. The internal files of all courts show when the forensic evaluations (11/1/24; 1/7/25) were received and whether they were considered. Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou No single district court can compel all of this discovery. The records span two states, four levels of courts, and multiple law enforcement agencies. Centralization allows one judge to issue one set of discovery orders that reach all of them. Centralization in the District of Delaware would place the consolidated proceedings within reasonable travel distance of all parties and witnesses. The District of Delaware is the court where the majority of the related state court proceedings originated (the Chancery action, the Superior Court ejectment, the JP Court evictions). The Delaware witnesses (Judges Noreika, Griffin, Conner, Clark, Robinson, Crowley, Wood, Danberg, Cline; the Delaware State Police; the Sheriff's Office) are all within the District. The Pennsylvania witnesses (Judges Hill, Roberts, Hall, Padilla; the Philadelphia Sheriff's Office; the Philadelphia Police Department; the Mullans; Tsiwen Law) are within reasonable travel distance of Wilmington, DE. The plaintiffs are indigent and *pro se*. Kenneth Talley is 90 years old with a documented cognitive impairment, severe hearing loss, and a first-to-second-grade reading level. Kristina Talley is disabled with cyclic vomiting syndrome. Requiring them to travel to two different districts for discovery, hearings, and trial would impose a burden that is both practical and constitutional. The ADA Title II obligation to provide reasonable accommodations (42 U.S.C. § 12131 et seq.; 28 C.F.R. § 35.130(b)(7)) supports centralization as the reasonable accommodation that allows the plaintiffs to participate in their own litigation.

## IV. JUST AND EFFICIENT CONDUCT OF THE ACTIONS

### *A. The Delays Demonstrate the Need for Coordination*

The most compelling argument for centralization is the documented delay. Two cases assigned to the same judge in the same district produced identical patterns of inaction: 192 days and 219 days of silence, followed by bulk denials without individual analysis. The 526 days since the Third Circuit's remand order in Action 1, with no substantive adjudication, is not a matter of judicial discretion, see

Exhibit D Third Circuit Opinion, No. 24-2358, filed 3/27/25 Plaintiffs insist there is a structural failure that centralization is designed to address. The Panel's purpose under § 1407 is "the convenience of parties and witnesses, and the just and efficient conduct of the actions." 28 U.S.C. § 1407(a). A case that has been pending for 526 days after a remand order, with no scheduling, no discovery, no trial date, and no substantive ruling, is the antithesis of "just and efficient conduct." Centralization before a different judge, with a firm scheduling order and a single discovery process, is the remedy. Exhibit D Third Circuit Opinion, No. 24-2358, filed 3/27/25 ; Exhibit G Three-Instance Eviction Pattern Table.

*B. The Common Questions Cannot Be Resolved in Fragmented Proceedings*

The six common questions of fact identified in Section II require discovery of records in both Delaware and Pennsylvania, across state and federal courts, law enforcement agencies, and private parties. In the current fragmented proceedings:

- Action 1 (D. Del.) can only compel discovery from Delaware-based witnesses
- Action 2 (D. Del.) can only compel discovery from Delaware-based witnesses
- Action 3 (E.D. Pa.) can only compel discovery from Pennsylvania-based witnesses

The ex parte communications span both states. The three eviction instances span both states. The judicial officers span both states. The bankruptcy stay violation spans both state and federal courts. No single district can compel all the necessary discovery. Centralization allows one judge to issue one set of discovery orders that reach all parties in both districts.

*C. The Risk of Inconsistent Rulings*

Without centralization, the three actions will be decided by different judges applying different standards to the same facts. The IFP question has already produced inconsistent results: the same plaintiffs, with the same declarations, were granted IFP by the Pennsylvania Supreme Court on 9/30/26 and denied by the Bankruptcy Court on 9/23/26. The "malicious" designation in the Court of Chancery has no equivalent in the federal courts, but the same underlying conduct (filing cases to seek relief for

constitutional violations) is the basis for both the designation and the potential Rule 11 sanctions. A single judge resolving the threshold factual questions would prevent these inconsistencies.

*D. The Burden on the Plaintiffs*

The plaintiffs are indigent, *pro se*, and Kenneth and Kristina are legally disabled. They have been litigating for six years without counsel. The current fragmented proceedings require them to:

- File separate motions in each district
- Track separate deadlines in each district
- Serve separate documents on separate parties in each district
- Attend separate hearings in different states
- Pay separate filing fees (or seek separate IFP rulings) in each district

See Exhibit J Index of 64 Related Cases.

*E. Case Law / Panel Orders*

Centralization reduces this burden to a single set of filings, a single set of deadlines, a single set of service requirements, and a single set of hearings. For a 90-year-old man with a first-to-second-grade reading level and a disabled daughter with a rare neurological disorder, this reduction is not a convenience. It is a necessity.

| Citation | Holding / Principle |
|---|---|
| *In re Multidistrict Civil Actions Litig.*, 283 F.3d 1043 (9th Cir. 2002) | The Panel's discretion is "broad" and "unfettered"; the standard is convenience and efficiency, not venue |
| *In re Seroquel Prods. Liab. Litig.*, 447 F. Supp. 2d 1376 (J.P.M.L. 2006) | The Panel "decides each matter of transfer on the unique facts of the cases before it" rather than precedent |
| *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 170 F. Supp. 2d 1346 (J.P.M.L. 2001) | Jurisdictional objections do not present an impediment to transfer — the transferee judge can resolve them |
| *In re Watson Fentanyl Patch Prods. Liab. Litig.* (J.P.M.L.) | "Transfer of an action is appropriate if it furthers the expeditious resolution of the litigation taken as a whole, even if some parties to the action might experience inconvenience or delay" |

| | |
|---|---|
| *In re Equifax, Inc., Customer Data Sec. Breach Litig.* (J.P.M.L.) | Location of pending actions and concentration of cases as key factors |
| *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1 (J.P.M.L. 2017) | One of the largest MDLs; illustrates the Panel's approach to common questions of fact |
| *In re Merscorp Inc., RESPA Litig.* (J.P.M.L.) | Location of relevant documents and witnesses as a factor in selecting the transferee district |
| *In re Asbestos Prods. Liab. Litig.* (J.P.M.L.) | The Panel's use of its own-initiative authority under § 1407(c)(i) |
| *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, MDL No. 2740 (J.P.M.L. 2020) | "Jurisdictional issues do not present an impediment to transfer of factually related cases, as plaintiff can present these arguments to the transferee judge" |
| *In re MLR, LLC, Patent Litig.*, 269 F. Supp. 3d (J.P.M.L.) | Tag-along actions and the Panel's authority to conditionally transfer them |
| *In re Droplets, Inc.*, MDL No. (J.P.M.L. 2012) | Denial of transfer where common questions of fact were insufficient |

*F. The Need for Expedited and Consolidated Proceedings*

Plaintiff Kenneth is ninety years old. The documented delay pattern is not an abstract procedural concern. It is a case where a man of ninety has spent more than three years in a single action — 1,173 days — with two written orders on the merits, and seventeen months in a second action without moving forward. The pattern is not one of a court working through a complex case. It is a pattern of inaction: 411 days between the Third Circuit's mandate and the first post-remand hearing; 219 days with no judicial action in Action 1; 192 days with no judicial action in Action 2; five reconsideration motions pending without ruling in each action since April 13, 2026; and, as of the date of this motion, ten and nine days with no ruling on three emergency motions seeking to preserve the 28289 Broadkill Road property from dissipation. Exhibit G Three-Instance Eviction Pattern Table. The urgency is not a matter of preference. It is a function of age. A ninety-year-old litigant does not have the time to absorb another cycle of inaction, remand, and reopening. The property at issue — 28289 Broadkill Road, Milton, Delaware — is the subject of a pending Motion to Cancel *Lis Pendens*. The only protection is the court's

own *lis pendens*, which the defendants are actively seeking to cancel a federal lis pendens using a state court action, all based on the rules of the Delaware Court of Chancery, see *Talley v. Horn*, No. 26-5793 (U.S. filed Sept. 16, 2025) (accepted Oct. 8, 2026). If that protection is removed while the emergency motions remain unruled, the plaintiffs will have file another appeal with the Delaware Supreme Court. This is precisely the situation § 1407 was designed to address. The statute authorizes the Panel to transfer actions "for the convenience of parties and witnesses and in order to promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The "just and efficient conduct" standard is not satisfied by a court that sets no hearing for 411 days after a mandate, denies nine motions in a single unanalyzed order, reverses its own referral in 22 days, and leaves emergency TRO motions unruled for ten days while Mr. Talley is subject to personal attacks by Judicial Officer Bonnie W. David by sending email messages to his deceased's wife, scheduling a hearing without notice on her birthday, November 16, 2026, then sending certified mail to the deceased, all of this after Mr. Talley filed a death certificate. Centralization before a single transferee judge, with a firm scheduling order and a defined pretrial calendar, is the only mechanism that addresses the documented pattern. The transferee judge would:

1. Set a single scheduling order governing all consolidated pretrial proceedings;
2. Rule on the pending emergency motions on an expedited basis;
3. Address the reconsideration motions and pending motions in each action on a defined schedule;
4. Eliminate the duplicative and inconsistent procedural history that has characterized the two actions to date.

The Panel need not find that the current forum is acting in bad faith. It need only find that the documented record — 1,173 days and 515 days, 411 days of post-mandate inaction, 219 and 192 days of judicial silence, and ten days of unruled emergency motions — does not reflect the "just and efficient conduct" that § 1407(a) requires. The record speaks for itself. Exhibit F Timeline of Delay - Filing Dates vs. Court Action Dates (Actions 1 and 2) ; Exhibit G Three-Instance Eviction Pattern Table. Exhibit J Index of 64 Related Cases

*G. Key Principles*

Plaintiffs cite basic authorities in § 1407 practice: Plaintiffs present common questions of fact — not legal questions. The cases are "complex, numerous, unresolved, and unique." Plaintiffs understand the Panel does not consider the legal or factual strength of any party's case, nor how a particular circuit's law applies. Plaintiffs understand Section § 1407 authorizes transfer for pretrial proceedings only. At the end of pretrial, the case(s) are remanded to the transferor district. The Supreme Court confirmed this in *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988), invalidating the Panel's "self-transfer" rule. Plaintiffs meet the minimum threshold — at least two cases in two different districts, even if all of the cases cannot be combined. Plaintiffs must appeal a denial based on these extraordinary circumstances via writ (mandamus) under 28 U.S.C. § 1651, which may be filed in the circuit court of appeals having jurisdiction over the transferee district, see Exhibit J Index of 64 Related Cases

## V. THE SIXTEEN FACTORS (FORDHAM LAW REVIEW, 2009)

Between 2021 and 2026, eight courts in two states committed 139 documented acts of constitutional and statutory violation against the plaintiffs. Plaintiffs meet all sixteen recurring factors the JPML cites in transfer orders:

1. Significant pretrial progress of an action pending in the transferee district
2. Docket conditions or resources of the transferee judge or district
3. Location of the first-filed action
4. Geographic centrality or proximity of the transferee district
5. Concentration of the actions between or among district courts
6. Concentration of potential tag-along actions
7. Location of the defendant's headquarters
8. Location of relevant documents
9. Location of key witnesses
10. Location of a government agency
11. Experience of the transferee judge
12. Willingness of the transferee judge
13. Preferences of the parties
14. Nature and complexity of the common questions of fact
15. *Likelihood of additional cases*
16. Type, magnitude, and complexity of discovery

See Fordham Law Review study (*Vol. 78, No. 1, Article 18*). Exhibit H Summary of 139 documented acts - 35+ distinct legal provisions violated - Eight courts - Two states - Six years Exhibit J Index of 64 Related Cases

## VI. CONCLUSION

Plaintiffs argue that the delay in the original district undermines the "just and efficient conduct" reasoning and supports centralization in a district that will actually move the case forward.

The delay in the original district is inconsistent with the effective administration of justice as contemplated by 28 U.S.C. § 1657(a) and the due process guarantee of the Fifth Amendment. The three actions involve six common questions of fact that can only be resolved through a single discovery process before a single judge. The convenience of the parties and witnesses favors centralization in Pennsylvania. The just and efficient conduct of the actions requires it. The documented delay — 526 days since the remand in Action 1; 192 days of silence in Action 2; 219 days of silence in Action 1; 139 documented acts of constitutional and statutory violation across eight courts — demonstrates that the current fragmented proceedings are not producing the "just and efficient conduct" that § 1407 requires.

Plaintiffs respectfully request that the Panel:

1. Transfer all three scheduled actions to Pennsylvania for coordinated or consolidated pretrial proceedings;
2. Review the entire list of cases for any other relevant proceedings that qualify for coordinated or consolidated pretrial proceedings;
3. Assign the consolidated actions to an impartial federal judge, in an impartial district;
4. Direct the transferee judge to issue a scheduling order within 30 days of the transfer;
5. Direct the transferee judge to set a single discovery deadline for all common questions of fact;
6. Retain jurisdiction in the transferee court to enter a final order disposing of all claims.

Respectfully submitted,

By: Kristina Karen Talley

Kristina Karen Talley, *pro se*
2353 East Cumberland Street
Philadelphia, PA 19125
(215) 694-0834
krissytalley@gmail.com

/s/ Kenneth R. Talley
Kenneth R. Talley, *pro se*
28467 Pocahontas Ave
Millsboro, DE 19966

/s/ Kurt R. Costello
Kurt R. Costello, *pro se*
2353 E. Cumberland Street
Philadelphia, PA 19125
(302) 650-3153
costellokurt@gmail.com

APPENDIX

Exhibit A Docket Report, 1:23-cv-00982-MN (D. Del.), PACER pull 10/25/26 ...................... 4, 8, 19

Exhibit B Docket Report, 1:25-cv-00662-MN (D. Del.), PACER pull 10/25/26 .......................... 4, 9

Exhibit C Notarized URL-Verified Records of Ex Parte Communications, 5 pages, notarized 9/14/26 .......................... 23, 24

Exhibit D Third Circuit Opinion, No. 24-2358, filed 3/27/25 .......................... 4, 8, 10, 34

Exhibit E Forensic and Psychological Evaluations, Dr. Cooney-Koss and Dr. Mapou .... 8, 17, 22, 23, 33

Exhibit F Timeline of Delay - Filing Dates vs. Court Action Dates (Actions 1 and 2) .... 4, 10, 12, 21, 25, 34, 36, 37

Exhibit G Three-Instance Eviction Pattern Table .......................... 12, 21, 34, 36, 37

Exhibit H Summary of 139 documented acts - 35+ distinct legal provisions violated - Eight courts - Two states - Six years .......................... 1, 18, 39

Exhibit I Seitzer Letter, 10/25/26, confirming no trustee objection to property retrieval ................ 14

Exhibit J Index of 64 Related Cases .......................... 4, 5, 6, 27, 28, 35, 37, 38, 39